## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**KEVIN CARTER**

      **Plaintiff,**

**v.**                                         **CASE NO.:   6:11-cv-1640-ORL-28-DAB**

**JERRY L. DEMINGS, in his official capacity as Sheriff of Orange County, Florida**

      **Defendant.**

_____/

### DEFENDANT'S CASE-DISPOSITIVE MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

Defendant, JERRY L. DEMINGS, in his official capacity as Sheriff of Orange County, Florida (the "Sheriff"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submits its Case Dispositive Motion for Summary Judgment and Supporting Memorandum of Law, and states the following:

### MEMORANDUM OF LAW

### I.     INTRODUCTION

In his Second Amended Complaint, filed on July 13, 2013, Plaintiff KEVIN CARTER ("Plaintiff" or "Carter") alleges the following Counts:   (1) Count I:   Unlawful Race Discrimination (42 U.S.C. § 1981); (2) Count II:  Deprivation of Liberty Interest; and (3) Count III:  Arrest without Probable Cause.  (Doc. 29).  The Sheriff is entitled to summary judgment on Plaintiff's Complaint in its entirety because Plaintiff cannot show that he suffered race discrimination, that he was deprived of his liberty interest, or that he was arrested without probable cause.

Plaintiff was employed by the Orange County Sheriff's Office as a deputy assigned to the Narcotics Unit.  In 2007, Plaintiff came under investigation for several charges of perjury related to verbal and written testimony given in conjunction with his job duties within the Narcotics Unit.  The Sheriff's Office submitted the results of its criminal investigation to the State Attorney's Office, which decided to file charges.  Then, pursuant to a capias issued by the Orange County Circuit Court, the Sheriff's Office arrested Carter for perjury in an official proceeding.  Thereafter, the Sheriff's Office commenced an administrative investigation, which concluded that Plaintiff committed several policy violations.  After two (2) administrative appeals, Plaintiff was terminated from his employment with the Orange County Sheriff's Office in September 2008 as a result of five (5) policy violations.

Plaintiff is unable establish a prima facie case of discrimination under § 1981, or present credible evidence to rebut the Sheriff's legitimate, nondiscriminatory reasons for all employment actions taken against Carter.  Plaintiff is also unable to establish that he was deprived of his liberty interest in his public name and reputation because he was provided with several meaningful opportunities for a name clearing hearing.  Finally, Plaintiff is unable to show that he was arrested without probable cause because the Sheriff arrested him pursuant to a capias issued by the State Attorney's Office and signed by the Clerk of Courts.  The Sheriff is therefore entitled to summary judgment as to all claims contained in Plaintiff's Second Amended Complaint.

## II.  STATEMENT OF UNDISPUTED FACTS

Kevin Carter began working for the Orange County Sheriff's Office on January 7, 2000 as a Deputy Trainee.  (Ex. A, 19:4;  Ex. B).  After successfully completing his training program, Carter transferred to the Field Services Division at the rank of Deputy II.  (Ex. A, 19:5-19:19;

Ex. C).  Carter remained in the Field Services Division until January 2004 when he transferred to the Narcotics Unit within the Special Investigations Division.  (Ex. A, 24:25-25:5; Ex. D).

In the Narcotics Unit, Carter worked primarily as an undercover officer making drug-related arrests.  (Ex. A, 33:14-35:24).  Other times, he worked on the takedown team, the support team that came on scene to arrest criminals who either sold drugs to or purchased drugs from the undercover officer.  (Ex. A, 36:7-38:2).  Carter remained in the Narcotics Unit for three (3) years until he transferred to the Fugitive Division in late 2006.  (Ex. A, 49:8-49:14).

In 2007, the Sheriff began investigating the Narcotics Unit's use of confidential informants in the 2003-04 timeframe.  (Ex. E, 46:15-47:8, 56:15-58:4).  The investigation was initiated after a local criminal defense attorney, Joerg Jaeger, subpoenaed documents from the Sheriff related to the use of a confidential informant in the arrest of his client.  (Ex. F, 29:8-30:20).  Jaeger believed that Jeffrey Lane, an officer in the Narcotics Unit, had used a confidential informant to purchase drugs from his client, Samuel Tanner, but failed to document the confidential informant in the arrest file.  (Ex. F, 33:25-36:4).

The Professional Standards Division (the "PSD") thereafter began to review other drug-related cases initiated by the Narcotics Unit and prosecuted by the SAO.  (Ex. F, 31:21-32:2).  PSD assigned the investigation to Sergeant Charles Deisler as lead investigator, who later involved Sergeant Cami Stough to assist with the investigation.  (Ex. E, 57:13-59:2).  Stough printed arrest reports, reviewed them, and identified a number of similar cases "where it appeared that [the Narcotics Unit] had just "happened upon a large amount of narcotics" and investigated those cases further.  (Ex F, 33:11-36:4).  Several of the cases identified by PSD involved Carter as the undercover officer.  (Ex. A, ex. 10 at 21-24).  PSD conducted criminal investigations of Carter, Sergeant Lisa Green (White), Sergeant Grant McMillan (White), Deputy

Guillermo Diaz-Pitti (Hispanic), Deputy Alejandro Ferrer (Hispanic), Deputy Nicolas Ortiz (Hispanic), and Lane (Black).  (Ex. A, ex. 10 at 13-27).  Notably, PSD did not investigate Deputy Collington Campbell (Black) and Deputy Jerold White (Black).

Carter's Arrest

Stough was assigned to investigate the cases involving Carter, including the 2004 arrest of Ricky Stubbs.  (Ex. F, 43:4-43:17).  Pending the criminal investigation, Carter was relieved of duty with pay on May 11, 2007, in accordance with General Order 5.1.2(4)(E).  (Ex. A, 86:14-87:19, ex. 1; Ex. J, 00032).

After completing their investigation, Stough and Deisler prepared a sworn Incident Report and concluded that Carter knowingly lied under oath on a material issue in sworn testimony at the trial of Ricky Stubbs by failing to disclose his use of a confidential informant.  (Ex. F, 99:25-101:1; Ex. A, ex. 7).  PSD attached the Incident Report to a Charging Affidavit, which it submitted to the SAO on May 17, 2007.  (Ex. F, 100:14-101:1; Ex. A, ex. 7).

The SAO reviewed the Charging Affidavit and sought a capias from the Circuit Court.  (Ex. E, 51:10).  The Orange County Clerk issued a capias for Carter's arrest on May 23, 2007.  (Ex. A, ex. 7).  The Sheriff's Office received the capias and prepared a Warrant Arrest Affidavit.  (Ex. A, ex. 7; Ex. F, 102:24:103-6).  Stough and Deisler arrested Carter the same day.  (Ex. A, ex. 7).  Carter was relieved from duty without pay on May 24, 2007 in accordance with General Order 5.1.2(4)(F), which authorizes the Sheriff to suspend an employee without pay if the employee is arrested, pending the administrative investigation and any administrative appeals.  (Ex. A, 97:25-98:7, ex. 3; Ex. J, 00033).  After his suspension, the Sheriff made several attempts to contact Carter to schedule a post-deprivation hearing regarding his suspension.  (Ex. A, 99:25-100:6, ex. 4).

After Carter's arrest, PSD continued working on its other criminal investigations related to Carter and ultimately submitted two (2) additional cases to the State Attorney.[1]  (Ex. A, 116:6-119:9, ex. 8, ex. 9).   The State Attorney's Office declined to seek an arrest for these criminal charges.  (Ex. A, 118:9-118:17).   On September 27, 2007, the State Attorney's Office withdrew the perjury charges against Carter because it was unable to locate a key witness.  (Ex. A, 113:20-114:11).   Carter returned to work and was transferred to the Records Division pending the administrative investigation.[2]  (Ex. A, 119:17-122:11).

Administrative Investigation and Appeals

PSD commenced its administrative investigation of the Narcotics Unit as a whole on October 9, 2007.  (Ex. A, ex. 10).   The accused employees included Chief Ronald Otterbacher (White), Commander Jeffrey Stonebreaker (White), Green, McMillan, Carter, Diaz-Pitti, Ferrer, Ortiz, and Lane.  (Ex. A, ex. 10).   Notably, Campbell and White were not accused of any misconduct.  (Ex. A, ex. 10).   The investigation sustained various policy violations against all of the accused except for Stonebreaker.[3]  (Ex. A, ex. 10).   Five (5) policy violations were sustained against Carter, and one (1) not sustained.  (Ex. A, ex. 10).

Carter received notice of the results of the administrative investigation on March 13, 2008,[4] and a Notice of Intention to Discipline for each policy violation on April 1, 2008.  (Ex. A, 131:8-131:12, ex. 12; Ex. G).   In response, Carter requested an administrative review.  (Ex. G; Ex. A, 132:8-136:22).   Captain Sandy Carpenter was appointed by the Assistant Sheriff's

---

[1] Contrary to Carter's assertion, these cases were submitted to the State Attorney prior to the Stubbs charges being dropped.  (Ex. A, 118:21-119:9). PSD submitted prosecutive summaries for the Hogan case on June 26, 2007 and for the Roberts case on September 12, 2007.  PSD did not submit a prosecutive summary for the Rodney cases.  (Ex. A, ex. 8, ex. 9, ex. 10 at 21-24).

[2] A transfer pending an administrative investigation is not considered discipline.  (Ex. J, G.O. 5.1.2(4)(B)(2)(i) at 00016 amending G.O. 342.0(4)(B)(2)(i) at 00026 ).

[3] The allegation of Unsatisfactory Performance against Stonebreaker was unfounded.  (Ex A., ex. 10).

[4] Carter said he does not remember getting the March 13, 2008 memo, but acknowledges that it was in the packet provided to him with the Administrative Investigation Report.  (Ex. A, 126:17-131:12).

secretary as the Administrative Review Captain to review Carter's appeal of the allegations, and notified by Assistant Sheriff Phillip B. Williams of his selection.  (Ex. H, 12:12-15:14; Ex. I, G.O. 5.1.0(4)(K)(1)(a) at 03822-03823).   Carpenter and Carter did not know each other personally.  (Ex. H, 15:12-15:14; Ex. A, 137:21[5]).  Carter submitted a substantial written appeal package on May 10, 2008, which included several hundred pages of attachments.[6]  (Ex. A, ex. 13).  On May 13, 2008, Carpenter notified Carter that per Carter's request, an Administrative Review Captain ("ARC") hearing had been scheduled for May 16, 2008.  (Ex. A, ex. 13).  Prior to the ARC hearing, Carpenter reviewed everything that was in Carter's appeal package, as well as all portions of the Administrative Investigation that were germane to the case.  (Ex. H, 27:8-34:3).

Carter appeared personally for the ARC hearing on May 16, 2008.  (Ex. A, ex. 13).  At the hearing, Carpenter considered Carter's arguments, his disciplinary history, other mitigating factors such as Carter's education, training, and military experience, and Carter's arguments related to other law enforcement officers and supervisors in the Narcotics Unit.  (Ex. H, 34:3-37:11).  Ultimately, Carpenter found Carter's appeals of the policy violations and severity of discipline without merit.  (Ex. H, ex. 19).

Thereafter, Carter was issued formal discipline via Notices of Disciplinary Action for five (5) different policy violations.[7]  (Ex. A, ex. 14).  Carter appealed the charges, as well as the severity of discipline to a Disciplinary Appeals Board.  (Ex. A, 147:3-147:14, ex. 14).  The DAB was also appointed by the Assistant Sheriff's secretary, and consisted of Captain Tom Foster,

---

[5] Carter initially stated that he knew Carpenter, but clarified that he was "aware of him" because he previously worked with Carpenter's brother.

[6] The attachments are referenced in, but omitted from the deposition exhibit.

[7] (1)  Termination for violation of 5.1.0(13) – Conformance to Laws (Hogan); (2)  41 Hour Suspension for violation of 5.1.0(3) – Unsatisfactory Performance (Rodney); (3)  Termination for violation of 341.0(13) – Conformance to Laws (Rodney); (4)  Termination for violation of 5.1.0(13) – Conformance to Laws (Stubbs); and (5)  Termination for violation of 5.1.0(13) – Conformance to Laws (Roberts).  (Ex. A, ex. 14).

Commander Brenda Brandenburger, and Deputy First Class Mike Walsh.[8]  (Ex. I; Ex. A, 15:21-16:1, ex. 15).  Foster notified Carter of his hearing, initially scheduled for August 1, 2008, as well as his right to submit a written appeal package and to proffer witnesses.  (Ex. A, 147:19-147:20, ex. 15).  Carter submitted a substantial written appeal package and proffered several witnesses.  (Ex. A, ex. 15).  Carter was also permitted to, but did not challenge any board member on the grounds of substantial conflict.  (Ex. I, G.O. 5.1.0(4)(K)(2)(b)(3) at 03826).  Carter then requested that Foster re-schedule the hearing, which was ultimately held August 26, 2008.  (Ex A, ex. 15).

At the DAB hearing, the DAB considered the information presented in Carter's written appeal package, as well as his presentation to the DAB.  (Ex. A, ex. 15).  Carter was represented by counsel and the public hearing lasted an hour and a half.  (Ex. A, 150:8-150:15).  It was attended, in Carter's words, by "everybody… all of [his] support… it was packed."  (Ex. A, 150:16-150:18).  The DAB issued Carter notice of its findings on August 27, 2008.  Ultimately, the DAB found that four (4) of Carter's appeals were without merit, and that one of his appeals had merit with regard to the level of discipline.  (Ex. A, 161:3-163:5, ex. 15).

Thereafter, the Sheriff reviewed the results of the DAB hearing and agreed with the board's majority as to each of the policy violations, and the severity of discipline.  (Ex. A, 164:4-164:22, ex. 16).  The Sheriff issued notice of his final determinations on September 3, 2008.  (Ex. A, ex. 16).  Carter received personal service of the Sheriff's notification on September 5, 2008, thereby terminating his employment.  (Ex. A, ex. 16).

---

[8] A Disciplinary Appeals Board (DAB) consists of a Captain, who serves as the chairman, a Commander, and a Deputy Sheriff.  The Sheriff selects DAB Captains every two (2) years, and may appoint up to three (3) at a time.  The Sheriff designates nine (9) commanders to serve on various DABs at any given time.  For each DAB, one Commander is selected to serve and two (2) are selected as alternates.  The Sheriff and the employee union, the Police Benevolent Association, jointly selected nine (9) deputies, each with over five (5) years of experience.  For each DAB, one Deputy is selected to serve and two (2) are selected as alternates.  (Ex. I, G.O. 5.1.0(4)(K)(2)(b)(3) at 03826).

III.   **LEGAL ANALYSIS**

A.  **Legal Standard**

Summary judgment is appropriate if it appears through pleadings, depositions, admissions, and affidavits that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1309 (11th Cir. 1994).  The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and the absence of a genuine issue of material fact.  Armstrong, 33 F.3d at 1309 (citing Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993)).  If the moving party carries its burden, the burden shifts to the nonmoving party, which "must do more than simply show there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

B.  **Race Discrimination**

In Count I of his Complaint, Plaintiff seeks to hold the Sheriff liable for race discrimination in violation of 42 U.S.C. §§ 1981 and 1983.  He alleges that he was arrested, transferred, and terminated because of his race.  The Sheriff is entitled to summary judgment on Carter's claim of race discrimination because Carter cannot establish a prima facie case of discrimination, because the Sheriff can articulate non discriminatory reasons for its action, and because Plaintiff cannot show that the nondiscriminatory reasons are pretextual.

"The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context." Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 at n. 11 (11th Cir. 2000), cert. denied, 534 U.S. 815 (2001). In order to establish a prima facie case of discrimination, a Plaintiff must use either direct or circumstantial evidence. EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000); see also Pace v. Southern Ry. Sys., 701 F.2d 1383, 1388 (11th Cir. 1983). If a plaintiff does not present any direct evidence of discrimination, he must use circumstantial evidence to establish a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-4 (1973); see also Springer v. Convergys Customer Mgmt., 509 F.3d 1344, 1347 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the defendant's articulation of a legitimate, nondiscriminatory reason is sufficient to rebut the presumption of discrimination raised by the plaintiff's prima facie case. Id. The burden of production then shifts back to the plaintiff to prove that the employer's alleged reason was pretext for unlawful discrimination. Id.

1. Carter Cannot Establish a Prima Facie Case

Carter does not present any direct evidence of discrimination. Thus, to establish his prima facie case of race discrimination based on the disparate treatment theory of discrimination, Carter must prove: (1) he belongs to a racial minority; (2) he was subjected to an adverse employment action; (3) the Sheriff treated similarly situated employees of other races more favorably; and (4) he was qualified to perform his job. Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)); see also McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008). Carter cannot

establish his prima facie case of discrimination because he cannot identify any similarly situated employees of other races who were treated more favorably.

In order to establish the "similarly situated" prong of his prima facie case, Carter must identify an employee who is not African-American who is similarly situated to Carter in all relevant respects.  Coar v. Pemco Aeroplex, Inc., 372 Fed.Appx. 1, 3 (11th Cir. 2010) (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).  "This prevents courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Id. (internal citations omitted) (citing Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006)).  Carter identifies three individuals as similarly situated comparators:  Sgt. Lisa Green, Sgt. Grantham McMillan, and Chief Ron Otterbacher.  (Ex. K, Response to Interrogatory No. 23).  All three (3) identified comparators are Caucasian, but none is similarly situated to Carter.  (Ex. K, Response to Interrogatory No. 23; Ex. A, ex. 10).

In order to be similarly situated, the identified comparators must have been involved in the same or similar misconduct.  Id., (citing Holifield, 115 F.3d at 1562).  More specifically, the 11th Circuit has held that the "quantity and quality of the comparator's misconduct [must be] nearly identical."  Burke-Fowler, 447 F.3d at 1323; see also Johnson v. Miller Brewing Co., 341 Fed.Appx. 477, 478 (11th Cir. 2009).  Carter was arrested, although the charges were dropped, for criminal misconduct (perjury) and committed five (5) separate policy violations, each relating to a separate incidence of untruthfulness.  Green, McMillan, and Otterbacher did not engage in the same or similar criminal conduct.

The Sheriff's Office conducted criminal investigations into Green and McMillan's conduct, but neither was arrested.  The Sheriff's Office submitted a Prosecutive Summary on Green to the Orange/Osceola State Attorney's Office seeking charges for Perjury While Not in

an Official Proceeding.  (Ex. A, ex. 10 at 25).  Green's criminal conduct is distinguished from

Carter's because (1) she was accused of committing perjury *while not in an official proceeding*,

while Carter was accused of perjury *in an official proceeding*; and (2) the State Attorney's office

declined to file charges against Green because it determined that the facts presented by the

Sheriff were insufficient to prove the case beyond a reasonable doubt.[9]  (Ex. A, ex. 10 at 25).

McMillan was investigated for Perjury in an Official Proceeding, but his criminal conduct is

distinguished from Carter's because due to the victims' refusal to cooperate, the Sheriff was

unable to collect sufficient facts to establish probable cause and submit a Prosecutive Summary

for the State Attorney's consideration.  (Ex. A, ex. 10 at 19-20).  The Sheriff did not seek

criminal charges against Otterbacher because its investigation did not reveal that he committed

perjury or any other crime.  (Ex. A, ex. 10 at 225-6).

Additionally, Green, McMillan, and Otterbacher did not commit the same or similar

policy violations.  Green was accused of one policy violation because she provided a <u>misleading</u>

statement in an official report, while Carter made <u>false</u> statements in testimony under oath and

sworn statements.  (Ex. L, Ex. A, ex. 10 at 25).  McMillan violated policy by approving a

subordinate's false incident report without verifying its accuracy, which is clearly distinguishable

conduct from Carter's false statements and reports.   (Ex. M, Ex. A, ex. 10 at 19-20).

Additionally, Green and McMillan prevailed in their appeals at their DAB hearings, which were

comprised of different officers than those presiding over Carter's DAB hearing, while Carter by

and large did not prevail at the DAB.  (Ex. A, 150:20-153:15).  Otterbacher violated policy

---

[9] Specifically, the State Attorney's Office, in declining to file charges, wrote, "We are deeply concerned the sworn police reports previously submitted to our office by [Sergeant Green] omitted salient facts concerning the [confidential informant's] involvement in the underlying drug transaction.  We are also troubled by [Sergeant Green] failing to provide our office with other reports generated by [the Orange County Sheriff's Office] that conflict/contradict statements made in her sworn police report, even after we tasked [Sergeant Green] to provide our office with this information.  With that said, the facts, as presented, are insufficient to prove this case beyond a reasonable doubt.  This decision relates solely to a lack of evidence to [prove] this case beyond a reasonable doubt, and should not be construed as a comment on whether probable cause existed."  (Ex. A, ex. 10 at 25).

because he failed to designate a member of the Narcotics Unit as the Custodian of Informant Activity Files as required by policy, which is also clearly distinguishable from Carter's policy violations for untruthfulness.  (Ex. N, Ex. A, ex. 10 at 225-6).

 "Different types and degrees of misconduct may warrant different types and degrees of discipline."  Knight, 330 F.3d at 1325.  Here, the different types and degrees of discipline issued to Green, McMillan, and Otterbacher were a product of different types and degrees of their misconduct.

There are no issues of material fact related to Carter's identification of similarly situated comparators.  None of Carter's three proposed comparators[10]  are similarly situated.  (Ex. K).  Because Carter cannot identify any similarly situated co-workers who were treated differently, an essential element of his prima facie case is lacking and Defendant is entitled to summary judgment on Plaintiff's race discrimination claims.

### 2.   The Sheriff's Articulated Nondiscriminatory Reasons

Even if the Court finds that Carter has established a prima facie case of race discrimination, the Sheriff is able to articulate a nondiscriminatory for each alleged employment action.  In articulating a legitimate, nondiscriminatory reason, an employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)); see also Soto v. Bank of America, 2005 WL 2861116, at *9 (M.D. Fla.

---

[10] Although he did not identify them as proposed comparators in his Interrogatory Response, Carter also alleges that the termination or resignation of three (3) Hispanic employees is further evidence of the Sheriff's discriminatory treatment of "minorities".  One of these employees, Nicholas Ortiz, is a similarly situated to Carter.  (Ex. A, ex. 10 at 17-18).  Ortiz is not an African American, and was terminated. (Ex. O).  Therefore, Carter had identified and admits to at least one comparator of a different race who was treated the same as Carter.  His convoluted argument grouping African-Americans and Hispanics into one racial category to show disparate treatment towards "minorities" is not persuasive.  The remaining employees, Guillermo Diaz-Pitti and Alejandro Ferrer are not similarly situated because they did not engage in the same or similar conduct.  (Ex. A, ex. 10 at 26-27).

2005).   Here, the Sheriff has produced legitimate, nondiscriminatory reasons for Carter's arrest,

transfer, suspension, and termination.

### a. Sheriff's Nondiscriminatory Reason for Carter's Arrest

With regard to his arrest, Carter conceded that his arrest was effectuated pursuant to a

capias.   Carter was not arrested by the Sheriff pursuant to a unilateral probable cause

determination.   Rather, the documentation of Carter's arrest shows that the Sheriff's Office

arrested Carter because it was ordered to in a capias issued by a circuit court judge and signed by

the Orange County Clerk of Courts.   In addition to this documentation, Carter acknowledged that

the State Attorney's Office reviewed the Prosecutive Summary and made the ultimate

determination to issue a capias.[11]   Additionally, the arresting officers both testified that they

arrested Carter because they were ordered to do so by a capias.

---

[11] Q.  Did you ever understand or have knowledge that, in fact, the sheriff's department sent reports to the state attorney who then reviewed it and made the ultimate determination?
A.  Yes.
Q.  You did know that?
A.  Yes.
Q. All right.  So before today you knew that?
A.  Right.
…
Q.  … And that would indicate – capias indicates, does it not, something that – where the state attorney has authorized it and gotten a capias signed by a state court judge.  Isn't that what that means?
A.  Yes.
…
Q.  Okay.  So that would tell you, someone looking at it today, perhaps not under the stress of being in the back seat of a patrol car, but the narrative is arrested on capias, that would tell you, and others, that that meant the state attorney was involved before the arrest; correct?
A.  Yes.
Q.  And, in fact, now that is your understanding that if you look at the third page, a capias was actually issued by a judge, signed by the clerk of court directing the sheriff to – directing or authorizing, whatever the right word is, your arrest in this case; right?
A.  Yes.
Q.  So based on this document and your understanding of the facts that – as you now know them to be, this, first of all, was not done on a probable cause arrest by the sheriff's office, correct?
…
A.  Yes.  I mean, I don't know it to be.  I think [its] something else, but …
Q.  That's what this paperwork shows, though; correct?
A.  Correct.

*b.  Sheriff's Nondiscriminatory Reason for Carter's Suspensions and Transfer*

With regard to Carter's suspension, he was "relieved from duty with pay in accordance with General Order 5.1.2, pending a criminal investigation" on May 11, 2007.  (Ex. A, ex. 1). The Sheriff had the broad authority to relieve Carter from duty with pay during the investigation of his criminal conduct pursuant to General Order 342.0(E), as amended by General Order 5.1.2(E).[12]  Carter concedes that he was suspended pending an investigation.  (Ex. A, 87:17-87:19, ex. 1).  This is consistent with the Sheriff's General Order and the reasons set forth in Carter's notification.  (Ex. A, ex. 1; Ex. J).

The Sheriff also had the authority to relieve Carter from duty without pay after his arrest and pending his administrative investigation pursuant to General Order 342.0(F), as amended by General Order 5.1.2(F).[13]  Carter acknowledged that he was notified of his suspension without pay.  (Ex. A, 98:2-98:7, ex. 3).  The notification explicitly stated the reasons for Carter's suspension.  (Ex. A, ex. 3).

When the criminal charges were dropped against Carter and he returned to work, the Sheriff has the authority to transfer him to another department pending his administrative investigation.  (Ex. J, 5.1.2(4)(B)(2)(i) at 00016, 00026).  Carter admits and acknowledges that the pending investigation of the Narcotics Unit was the only reason for his transfer to the Records Unit.  (Ex. A, 119:17-122:11).  According to policy, this type of transfer is purely administrative, and does not constitute discipline.  (Ex. J, 5.1.2(4)(B)(2)(i) at 00016, 00026).

---

[12] "Personnel holding the rank of Lieutenant, equivalent, or above, are authorized to relieve from duty a subordinate with pay during the investigative period providing they have cause to believe that the employee constitutes a safety risk to him or herself, the agency or others; agency operations may be impeded; to support public confidence in the agency and its personnel; or as the manager otherwise deems necessary."  (Ex. J at 00017, 00032).
[13] "If any employee is arrested for, or charged with, a felony or misdemeanor, he or she may be suspended without pay during the investigatory period and any administrative appeals.  The suspending authority shall provide the employee with written notice of the charges against him or her, such as the applicable arrest report or affidavit, supporting the suspension without pay."  (Exhibit J at 00019, 00033).

Based on the documentation of Carter's suspensions and transfer, as well as his own testimony at deposition, there are no disputed issues of material fact with regard to the reasons for his suspension.  It is undisputed that Carter was initially suspended with pay pending an active criminal investigation of his conduct, subsequently suspended without pay after his arrest and pending his administrative investigation, and upon his return to work after the charges were dropped, transferred to the Records Unit pending his administrative investigation.  Therefore, there is no disputed issue of material fact with regard to the Sheriff's articulated nondiscriminatory reason for Carter's suspension or transfer.

*c.   Sheriff's Nondiscriminatory Reason for Carter's Termination*

Carter was terminated by the Sheriff because the Sheriff concurred with the findings of the Disciplinary Appeals Board that Carter violated policy.  "Title VII allows employers to terminate an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Yates, 508 F.Supp.2d at 1098 (internal quotations omitted) (quoting Nix, 738 F.2d at 1187).  "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." Yates, 508 F.Supp.2d at 1099.

The Sheriff's final notice to Carter specifically identifies the nondiscriminatory reasons for finding that Carter violated agency policy:

- With regard to the Ricky Stubbs case, the Sheriff determined that this conduct violated General Order 5.1.0(13) Conformance to Laws and agreed with the Disciplinary Appeals Board, which unanimously found the severity of the proposed discipline, termination, appropriate.

- With regard to the Emanuel Hogan case, the Sheriff determined that this conduct violated General Order 5.1.0(13) Conformance to Laws and agreed with the Disciplinary Appeals Board, which unanimously found the severity of the proposed discipline, termination, appropriate.

- With regard to the Todd Roberts case, the Sheriff determined that this conduct violated General Order 5.1.0(13) Conformance to Laws and agreed with the Disciplinary Appeals Board, which unanimously found the severity of the proposed discipline, termination, appropriate.

- With regard to the Angela Rodney case, the Sheriff reached two conclusions. First, the Sheriff determined that this conduct violated General Order 5.1.0(3) Unsatisfactory Performance and agreed with the Disciplinary Appeals Board that Carter's appeal of the severity of the proposed discipline had merit.  The Sheriff therefore imposed a 40 hour suspension.  Second, the Sheriff determined that this violated General Order 5.1.0(13) Conformance to Laws and agreed with the Disciplinary Appeals Board, which unanimously found the severity of the proposed discipline, a 41 hour suspension, appropriate.

(Ex. A, ex. 16).

Carter does not allege any procedural deficiencies in the investigatory process. [14]  While Carter disagrees with the substantive conclusions of PSD, the ARC hearing, the DAB, and the Sheriff, he cannot dispute that each decision-maker offered a nondiscriminatory reason for finding that Carter violated the Sheriff Office's policy.  Therefore, there is no genuine issue of material fact with regard to the Sheriff's proffered legitimate, nondiscriminatory reasons for Carter's termination.

### 3. The Sheriff's Articulated Nondiscriminatory Reasons are not Pretext for Race Discrimination

There are no facts present in this case to suggest that the Sheriff's nondiscriminatory reasons for Carter's arrest, suspension, transfer, and termination were pretextually motivated by race.  Plaintiff admits that he was arrested based on a capias issued by the Circuit Court.  He admits that he was suspended with pay pending a criminal investigation, and subsequently without pay because of his arrest and pending his administrative investigation.  He admits that he

---

[14] The Sheriff anticipates that Carter will argue superfluously regarding the sufficiency and substance of the Sheriff's Internal Investigation, the Administrative Review Captain hearing, and the Disciplinary Appeals Board hearing.  Whether the Sheriff's investigation interviewed the "right" witnesses, reviewed the "right" documents or issues, and reached the "correct" conclusion is not for this Court to decide.  Rather, the Court's inquiry should be limited to whether the investigation and subsequent administrative appeal was legitimate and nondiscriminatory.  There is no genuine issue of material fact here.  The Sheriff has simply investigated Carter's alleged violation of its rules, determined that Carter violated its rules, and denied Carter's administrative appeal based on its merits.

was transferred to the Records Unit pending the administrative investigation.  Finally, Carter admits that there is no dispute that he was terminated as a result of an extremely thorough administrative investigation, and a failed administrative appeal.  In short, there is no evidence that the reasons articulated by the Sheriff are both *untrue* and *based on race*.

In order to establish that an employer's articulated reason is pretext for discrimination, a plaintiff must show "that the reason was false *and* that discrimination was the real reason." Dawson v. Henry Cnty. Police Dept., 238 F. Appx. 545, 549 (11th Cir. 2007) (citing Brooks v. Cnty. Com'n of Jefferson Cnty., 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original). To establish pretext, the plaintiff must meet the employer's reason "head on and rebut it." Wilson v. B/E Aeorospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004); Cf. Evers v. Gen. Motors Corp., 770 F.2d 884, 986 (11th Cir. 1985) ("Conclusory allegations [in an affidavit] without specific supporting facts have no probative value.").  "It is not enough, in other words, to *dis*believe the employer; the fact finder must *believe* the plaintiff's explanation of intentional discrimination."   St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993) (emphasis in original).

Plaintiff cannot "second-guess the business judgment of employers" to establish pretext. Combs v. Platinum Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).  In other words, "a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where… the reason is one that might motivate a reasonable employer."  Id.  Courts do not sit as "super-personnel" departments to re-examine the otherwise lawful business and disciplinary decisions of an employer or to question the wisdom of the decision.  Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1244 (11th Cir. 2001).  The Eleventh Circuit explained:

> [T]he inquiry into pretext centers upon the employer's beliefs, and
> not the employee's own perceptions of his performance.  Thus,
> where the employer produces performance reviews and other
> documentary evidence of misconduct and insubordination that
> demonstrate poor performance, an employee's assertions of his
> own good performance are insufficient to defeat summary
> judgment, in the absence of other evidence."

Holifield, 115 F.3d at 1565; see also Soto, 2005 WL 2861116, at *9 (holding that plaintiff's

disagreement with her employer's assessment of her performance and with the wisdom of its

policies did not impeach the employer's good faith opinion of the plaintiff as an employee); see

also Martinez v. Workforce Central Florida, 2008 WL 1806119, at *9 (M.D. Fla. 2008) (holding

that where record evidence existed supporting employer's opinion of plaintiff's work

performance and where employer and an outside investigator both plainly investigated plaintiff's

conduct, plaintiff's protestations that employer's findings were incorrect were not sufficient to

refute employer's assessment).

Carter's entire case is founded on his perception of his performance in the Narcotics Unit

and his erroneous belief that he did nothing wrong.  In considering the instant motion, the

Court's role is not to re-visit the criminal and administrative investigations of Carter's conduct.

The results of the Sheriff's investigations constitute lawful business and disciplinary decisions,

and absent any evidence of discriminatory intent, the wisdom of the Sheriff's decisions may not

be questioned.

Carter's arrest was legitimate without any pretext of discrimination.  The Sheriff,

independently of the State Attorney's Office, conducted a criminal investigation, prepared a

Prosecutive Summary, and submitted a Charging Affidavit for the State Attorney's

consideration.  Then, two separate government offices independently reviewed the Sheriff's

investigation and ordered Carter's arrest.  The State Attorney's Office made an independent

determination to seek a capias from a Circuit Court Judge, and a Circuit Court judge made an independent determination to issue a capias for Carter's arrest.  There is absolutely no evidence whatsoever that Carter's arrest was racially motivated.[15]  Clearly, there is no genuine issue of material fact with regard to whether the Sheriff's proffered reasons for Carter's arrest were pretextual.

Carter's suspension is also legitimate without any pretext of discrimination.  The Sheriff clearly had the authority to suspend Carter with pay pending his criminal investigation and without pay after his arrest.  Whether the Sheriff's policy is wise is not an issue of fact in this case.  There are no facts to suggest that this reason is false, that Carter was suspended because of his race, or that the policy was selectively enforced because of Carter's race.  Futher, when Carter returned from work, it is undisputed that the Sheriff transferred him to the Records Unit pending the completion of its administrative investigation.  Therefore, there are no genuine issues of fact with regard to whether the Sheriff's proffered reasons for Carter's suspensions and transfer were pretextual.

Carter's termination is also legitimate without any pretext of discrimination.  There is ample documentary evidence of Carter's misconduct.  His termination was the product of an administrative investigation that took six (6) months to conclude, and 258 pages to explain.  Whether the PSD investigators got it right is not a factual dispute in this case.  There is no evidence at any point throughout the administrative investigation or the subsequent administrative appeals of any racial animus or motivation.  The Sheriff found that Carter committed more severe policy violations than most of his peers, and his ultimate discipline

---

[15] Carter conceded that he had no evidence that the Sheriff's criminal investigation was racially motivated.  When asked whether race ever came up in his interviews with Professional Standards, Carter replied, "I wish I could have got him to say it… because in my heart, I know."  (Tr. 83-84).  Carter's belief "in his heart" does not even constitute a scintilla of evidence of discrimination.

reflected those findings.  Right or wrong, there is no evidence that the Sheriff terminated Carter as a result of any racial animus.[16]

Carter's beliefs about the wisdom of the Sheriff's policies are simply not relevant.  In any case, regardless of those policies, Carter lied under oath.   A criminal investigation, a State Attorney, a Circuit Court judge, an administrative investigation, an Administrative Review Captain, and a Disciplinary Appeals Board all concurred.  Even if Carter did work undercover because of his race, he was not disciplined because of his race.  He was disciplined because he lied.  The findings of the Sheriff's investigations remain:  Carter lied under oath and in sworn statements on multiple occasions.   Carter may believe that the Sheriff's Office, the State Attorney, the Circuit Court judge, the Administrative Review Captain, and the Disciplinary Appeals Board were all wrong.  But in order to defeat summary judgment, he has to show that every one of these decision makers acted with discriminatory intent.  He has no evidence to show that any one of them acted with discriminatory intent.

Right or wrong, the Sheriff made a good faith determination based on an extremely thorough and precise investigation and a multi-level process of independent review.  Right or wrong, there is no genuine issue of material fact regarding whether the Sheriff's reasons for taking disciplinary action against Carter were pretextual.  Accordingly, the Sheriff is entitled to summary judgment as to Plaintiff's claims of race discrimination.

---

[16] Carter's theory of the case appears to be that there was an inherent racial bias in the Narcotics Unit because minority officers were forced to perform the majority of undercover work.  He acknowledged that it was necessary to use minority officers because the Narcotics Unit's work focused on drug control in minority areas throughout Orange County, but disagreed with this practice of focusing drug enforcement efforts on minority neighborhoods. Carter believes that minority officers put their necks on the line and were put in a position to fail because of the volume of arrests.  Basically, Carter claims that if he was not African-American, he would not have been working undercover, and he would not have been put in a position to lie about confidential informants.  It is not this Court's role to question the law enforcement techniques of the Sheriff's Narcotics Unit, of which Carter was well aware of when he shadowed the Narcotics Unit prior to his request to voluntarily transfer into the Narcotics Unit.  (Ex. A, 46:19-46:25).  Carter's distaste for law enforcement decisions made in the Unit after he willingly took a job in Narcotics does not establish that his termination was racially motivated.  His perception of and opposition to the policies and practices of the Narcotics Unit are not sufficient to defeat summary judgment.

C.  **Deprivation of Liberty**

In Count II of his Complaint, Plaintiff seeks to hold the Sheriff liable for deprivation of his liberty interests in violation of the Fifth and Fourteenth Amendments to the United States Constitution.  In cases alleging a deprivation of liberty interest arising from reputation damage, a plaintiff must show:  "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for [an] employee name clearing hearing." Buxton v. City of Plant City, 871 F.2d 1037, 1042-43 (11th Cir. 1989).  The basis for Carter's liberty interest claim is unfathomable because it is undisputed that the Sheriff provided Carter with multiple meaningful opportunities for an employee name clearing hearing.  The Sheriff is therefore entitled to summary judgment on Carter's liberty interest claim.

Carter's liberty interest claim fails for two reasons.  First, the Sheriff did not publish a false statement attendant to Carter's discharge.  Carter's termination for multiple violations of Sheriff's Office policy was amply supported by an extensive and thorough administrative investigation and by two (2) independent denials of Carter's appeal by the Administrative Review Captain and the Disciplinary Appeals Board.  Carter's difference in opinion does not make the agency's statement false.  Rather, it is unequivocally true that the Sheriff terminated Carter because it determined that he committed several policy violations and because Carter's appeal of that determination and severity of discipline was denied.

Carter's liberty interest claim also fails because he was afforded multiple opportunities for a name clearing hearing.  The only due process required in a case where a liberty interest arising from alleged reputational damage is implicated is a hearing for the sole purpose "to provide the person an opportunity to clear his name." Codd v. Velger, 429 U.S. 624, 627 (1977).

The hearing "need not take place prior to [the employee's] termination or to the publication of related information adverse to his interests."  Campbell v. Pierce County, Georgia, 741 F.2d 1342, 1345 (11th Cir. 1984).  A pre-termination hearing is not necessary, and a post-termination hearing alone is sufficient to satisfy due process.  Id. (citing Rodrigues de Quinonez v. Perez, 596 F.2d 486 (1st Cir. 1979).  Regarding the substance of the hearing, the employee is entitled to notice of the charges against him and an opportunity to support his allegations by brief argument, however informal.  Id. (internal citations omitted) (citing Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 16 (1978)).

Here, it is undisputed that Carter received and participated in several name-clearing hearings.  With regard to his suspension without pay, the Sheriff attempted to contact Carter on multiple occasions to schedule a post-deprivation hearing.  (Ex. A, ex. 2).  Carter never responded.  With regard to his termination, Carter was afforded a pre-termination hearing before the Administrative Review Captain and a post-termination hearing before the Disciplinary Appeals Board.  Carter does not allege that he did not receive a name clearing hearing.  He alleges that his name clearing opportunities were deficient because (1) he could not confront or cross-examine his accusers; (2) he was not permitted to appear directly before the Sheriff; and (3) one of the presiding officers allegedly "rubber stamped" the investigatory report.[17]

None of these alleged procedural deficiencies are required in a due process name-clearing hearing.    Rather, a name clearing hearing "is provided simply to cleanse the reputation of the claimant."  Campbell, 741 F.2d at 1345.  Carter's ARC hearing and DAB hearing each provided him with this opportunity and each independently satisfied his liberty interest due process rights

---

[17] This final allegation is patently false.  The presiding officer over the ARC hearing, Captain Sandy Carpenter testified that he read Carter's written statement in its entirety, considered the evidence presented by the Sheriff and by Carter, considered Carter's disciplinary history, and considered mitigating factors.  (Carpenter Tr. 27-33).  Carter's cursory and unsupported allegation to the contrary does not create an issue of fact.

with regard to his termination.  The procedural deficiencies raised by Carter are not required by law, and therefore, there is no disputed issue as to whether Carter received a meaningful opportunity for a name clearing hearing.  Because Carter cannot establish that he was deprived of a name clearing hearing or that a false statement attended his termination, the Sheriff is entitled to summary judgment as to Plaintiff's liberty interest claim.

### D. **False Arrest**

Finally, in an action for arrest without probable cause, the court must grant summary judgment if probable cause existed at the time of arrest.  Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004).  Furthermore, a plaintiff cannot pursue a claim of false arrest where the arresting officers acted pursuant to a facially valid capias.  Smith v. Losat, 2009 WL 1514647 at *5 (M.D. Fla. 2009).  Here, the Sheriff arrested Carter acting pursuant to a facially valid capias and probable cause order.  Carter's Warrant Arrest Affidavit also reflects that he was "Arrested on Capias."  In fact, Carter himself acknowledges that the Sheriff cannot legally ignore a capias that directs an individual to be arrested.  (Tr. 238).  Therefore, because probable cause existed at the time of Carter's arrest, as set forth in a facially valid capias, the Court must grant summary judgment.[18]

---

[18]   Plaintiff has indicated to the Sheriff that he intends to rely on Harper v. City of Los Angeles, 533 F.3d 1010 (9th Cir. 2008) to defeat summary judgment on his false arrest claim.  In Harper, the court acknowledged the "well-settled principle that the filing of a criminal complaint immunizes investigating officers… from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." Id. at 1027 (internal citations omitted).  A plaintiff alleging false arrest under § 1983 may only rebut this presumption by "showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment." Id.  Assuming the legal precedent established in Harper is binding on this Court, which the Sheriff does not concede, there are no facts or evidence to rebut the presumption that the Sheriff is immune from Carter's § 1983 claim.  Plaintiff elicited testimony from Stough and Deisler that the State Attorney questioned them prior to making his probable cause determination, but there is no evidence that Stough, Deisler, or anyone else from the Sheriff's Office in any way pressured the State Attorney to file charges.  In fact, the State Attorney's Office declined to file charges on two (2) other cases involving Carter, and one (1) case involving Lisa Green.   Any speculation that the State Attorney was pressured or caused to act contrary to his independent judgment is pure conjecture and insufficient to defeat summary judgment.

Even without the capias, Carter's claim for false arrest fails.  In order to show that his Fourth Amendment rights were violated, Carter must show that probable cause did not justify his arrest.  <u>Motes v. Myers</u>, 810 F.2d 1055, 1059 (11th Cir. 1987).  "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed."  <u>Brown v. City of Huntsville, Ala.</u>, 608 F.3d 724, 734 (11th Cir. 2010).  Here, the Sheriff had arguable probable arrest based on the collective knowledge of the PSD, derived from sworn witness statements, sworn police records, and official court transcripts, which caused the officers to believe that Carter committed perjury. Carter's belief that the PSD should have interviewed additional witnesses does not diminish its reasonableness or eliminate the existence of probable cause.  Accordingly, because probable cause existed at the time of Carter's arrest, Defendant is entitled to summary judgment as to Plaintiff's false arrest claim.

WHEREFORE, the Sheriff respectfully requests that this Court grant its Motion for Summary Judgment in its entirety as to Plaintiff's Amended Complaint.

Dated:          May 1, 2013                              Respectfully Submitted,

/s/ *Mark. E. Levitt*

Mark. E. Levitt, Esq.
Florida Bar No.:  0193190
mlevitt@anblaw.com
Wayne L. Helsby, Esq.
Florida Bar No.:  362492
whelsby@anblaw.com
Marc A. Sugerman, Esq.
Florida Bar No.:  0081876
msugerman@anblaw.com
**ALLEN, NORTON & BLUE, P.A.**
1477 West Fairbanks Ave.

Suite 100
Winter Park, Florida 32789
(407) 571-2152
(407) 571-1496 Facsimile
Counsel for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 1, 2013, a true and correct copy of the foregoing was filed with the Clerk of the Court via CM/ECF System, which will send a notice of electronic filing to:

Gary D. Wilson, Esq.
Wilson McCoy, P.A.
711 North Orlando Avenue, Suite 202
Maitland, Florida 32751

s/ *Mark. E. Levitt*
Mark. E. Levitt, Esq.

354493