**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**KEVIN S. CARTER,**

**Plaintiff,**

**-vs-**                                          **Case No.  6:11-cv-1640-Orl-28DAB**

**JERRY L. DEMINGS, in his official**
**capacity as Sheriff of Orange County,**
**Florida,**

**Defendant.**

_____

**ORDER**

Kevin S. Carter brings the instant action pursuant to 42 U.S.C. §§ 1981 and 1983 against his former employer, the Sheriff of Orange County, Florida.[1]  Carter alleges race discrimination under § 1981, denial of due process in violation of the Fifth and Fourteenth Amendments, and arrest without probable cause in violation of the Fourth and Fourteenth Amendments.  The case is now before the Court on the Sheriff's Case-Dispositive Motion for Summary Judgment (Doc. 34) and Carter's Memorandum in Opposition (Doc. 35).[2]  As set forth below, the Sheriff's motion must be granted as to all three of Carter's claims.

---

[1]Kevin Beary was the Sheriff at the time of the events at issue in this case.  Jerry Demings was elected to his first term as Sheriff in November 2008, and he is sued only in his official capacity here.  (See Doc. 35 at 2).  "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).

[2]The Sheriff did not file a reply to Plaintiff's opposition memorandum, though one is permitted.  (See Am. Case Management & Scheduling Order, Doc. 33, at 6).

I.  Background

After serving in the United States Army for more than twenty years, in January 2000 Carter began his employment at the Orange County Sheriff's Office as a Deputy Trainee. Carter then worked in the Field Services Division as a Deputy II until transferring to the Narcotics Unit within the Special Investigations Division in January 2004.  While in the Narcotics Unit, Carter largely worked undercover making drug-related arrests, though he sometimes worked on the "takedown team"—the support team that arrested those who engaged in drug transactions with the undercover officers.  In late 2006, Carter transferred from the Narcotics Unit to the Fugitive Division.

In early 2007, after Carter had transferred out the Narcotics Unit, the Sheriff's Office's Professional Standards Division ("PSD") began investigating a November 2003 Narcotics Unit case in which Deputy Jeffrey Lane was the acting undercover agent.  The arrestee's attorney suspected that Lane had given false testimony regarding whether a confidential informant had been used in that case, and the attorney sent a letter of complaint to the Sheriff's Office about the matter.

Larry Krantz, then a lieutenant in PSD, asked Charles Deisler, a PSD sergeant, to look into the attorney's allegations.  (Deisler Dep., Docs. 34-13 & 34-14, at 44; Krantz Dep., Ex. 1 to Doc. 35, at 36, 40).[3]   After reviewing the court file and discovering some

---

[3]In his summary judgment motion, the Sheriff refers to exhibits lettered A through O. (See Doc. 34 passim).  These exhibits were filed as attachments to the summary judgment motion (Docs. 34-1 through 34-24), but in the record they are not labeled with letters. Although they are labeled in that manner in the courtesy copy binders that were provided to the Court, the courtesy copies are not the official record.  As noted by Carter, no index to the Sheriff's exhibits has been filed either; in his response memorandum Carter has provided

inconsistencies that concerned him, Deisler reported back to Krantz that there could indeed have been an issue regarding perjury in Lane's deposition.  (Deisler Dep. at 44-45).  Krantz instructed Deisler to continue a criminal investigation of Lane and to obtain a statement from Lane.  (Id. at 45, 47).  Lane acknowledged a practice of lack of disclosure of informant involvement in undercover drug transactions.  (Id. at 48).

PSD then became concerned about whether the case reported was an isolated incident or a systemic problem, and Deisler was instructed to begin a criminal investigation of other Narcotics Unit cases.  (Id. at 48-49).  Once the investigation expanded beyond Lane, PSD Sergeant Cami Stough assisted Deisler with the investigation.  (Id. at 57).  In the expanded investigation, Stough and Deisler examined 2003 and 2004 Narcotics Unit cases.  Stough reviewed records looking for cases similar to the problematic Lane case, in which no informant was noted in the report and it appeared that the Narcotics Unit had just happened upon drugs.  (Stough Dep., Doc. 34-15, at 33).  When such cases were discovered, further inquiry was made.  (Id. at 41).

During the 2003-2004 time frame, the Narcotics Unit consisted of approximately twenty-five officers.  (Deisler Dep. at 64-65).  The supervisors in the unit included Chief Ron Otterbacher, Captain Mark Lang, and Sergeants Lisa Green, Wayne Calarco, and Grantham McMillan, all of whom were Caucasian.  (Id. at 65).  Approximately twenty-five percent of the

_____

a correct listing of the Sheriff's exhibits.  (See Doc. 35 at 2-3 n.2).  The citations to the Sheriff's summary judgment evidence in this Order are to the locations in the electronic record where the evidence can be found—not to lettered exhibits.  Carter has submitted three exhibits—Exhibits 1, 2, and 3 to his response memorandum (Doc. 35)—and they are referred to as such.

Narcotics Unit was made up of minority employees:  Carter, Lane, Jerold White, and Collington Campbell, who were African-American; and Alejandro Ferrer and Nicholas Ortiz, who were Hispanic.  (Id. at 65-67).  PSD did not find improprieties in the reports of White or Campbell, but the case report review led to further investigation of some other Narcotics Unit deputies, including Carter, Ortiz, Ferrer, McMillan, and Green.[4]  During their investigation of the Narcotics Unit, Deisler and Stough became aware that there was an accepted practice within the unit of officers signing reports in a stack and signing reports for arrests of which they were not a part.  (Id. at 72).  Additionally, they learned that it was a common practice within the Narcotics Unit—acknowledged by some of the supervisors—not to list a confidential informant in a report unless the informant had actually touched the drugs or money.  (Stough Dep. at 54; Deisler Dep. at 89-91).  Another issue reported by those who were interviewed was that "deputies were evaluated strictly on numbers" and statistics and that to that end, the undercover agents were put back on the street as soon as possible, even at the expense of accurate paperwork.  (Deisler Dep. at 85-86).

One of Carter's cases that caught the attention of PSD involved the January 20, 2004 arrest of Ricky Stubbs for the sale of cocaine behind an ABC store on Silver Star Road in Orlando.  Carter's report and charging affidavit regarding Stubbs recounted a hand-to-hand exchange of drugs for money between Carter and Stubbs and did not mention an informant.  (See Incident Report, part of Ex. 7 to Carter Dep.,[5] at 3-4).  Carter also testified at Stubbs's

_____

[4]Deisler was the lead investigator regarding the conduct of Ortiz and Lane, and Stough was the lead investigator regarding the conduct of Carter and Green.

[5](Docs. 34-1 through 34-9).

-4-

trial that "[i]t was just me and him standing right back there in the back." (Id. at 6).  However, when Stough reviewed the court file for Stubbs's case, she noticed that a witness named Susan[6] was listed for the defense, and she also found Susan's name written on an evidence envelope for an incident involving an informant on the same date in the area where Stubbs was arrested.  (Id. at 4-7).

Stough then undertook to locate Susan to question her about these incidents, sending letters and otherwise trying to contact her.  In response to Stough's inquiries, Susan eventually telephoned Stough.  (Id. at 8).  According to one of Stough's reports, during their May 10, 2007 phone conversation Susan expressed concern about why Stough wanted to talk to her, but Stough assured Susan she merely wanted to discuss the work that Susan had done with the Narcotics Unit in 2004.  (Id.).  Susan then stated, "I didn't do nothing [sic] wrong!  I did what they told me.  But I don't know the cops' names.  One was a black guy, real muscular in a green Mustang.  I only bought from Rick behind the ABC and I did (1) other."  (Id. (alteration in original) (emphasis removed)).  Susan elaborated that the black deputy—who meets the description of Carter—gave her twenty dollars and walked with her to the back of the ABC, where she asked Ricky Stubbs for twenty dollars' worth of crack.  (Id.).  Susan further reported that that same day, she assisted the deputies by purchasing crack from a residence.  (Id.).  Deisler and Stough met with Susan in person later that day, and she reiterated what she had told Stough on the phone.  (Id.).

The next day, May 11, 2007, Deisler called Carter and asked him to come to the PSD.

---

[6]In most of the record, Susan is identified only by her first name, and the Court will refer to her in this manner as well.

(Id. at 8-9).  When Carter arrived, Deisler told him he had been summoned for a non-custodial interview but was not obligated to participate and was free to leave.[7]  (Id. at 9).  Carter opted not to participate.  (Id.).  Also on May 11, Mark Lang, as Acting Chief of the Special Investigations Division, issued a memo to Carter relieving him of duty with pay pending a criminal investigation.[8]  (Ex. 1 to Carter Dep.).  Three days later, on May 14, Deisler and Stough drove to the Holmes Correctional Institution in Bonifay, Florida, and talked to inmate Ricky Stubbs.  (Incident Report at 9).  Stubbs stated that on the day of his arrest, Susan had approached him behind the ABC store with a black male and asked him for twenty dollars' worth of cocaine.  (Id.).

On May 17, 2007, Stough submitted to the state attorney's office her Incident Report and a charging affidavit accusing Carter of perjury in an official proceeding in violation of section 837.02(1), Florida Statutes, based on Carter's testimony at Stubbs's January 2005 trial.  (See Ex. 7 to Carter Dep.).[9]  The state attorney's office then sought a capias from the circuit court, and the capias was issued on May 23, 2007.[10]  (See id.; see also Joint Pretrial

---

[7]Krantz explained in his deposition that employees are obligated to cooperate in administrative investigations but could not be compelled to do so in criminal investigations. (Krantz Dep. at 96-98).  Once the criminal investigation of Lane began, several officers declined to cooperate.  (Id. at 95-97; see also Stough Dep. at 139).

[8](See Sheriff's General Order 342.0 § 4.E, Doc. 34-19 (providing for suspension with pay during investigative period)).

[9]PSD had previously submitted two of Lane's cases to the state attorney's office for assessment of charges of perjury in an official proceeding, and the state attorney's offices filed charges against Lane in those cases on May 9, 2007.  (See Administrative Investigation Report, Ex. 10 to Carter Dep., at 15).

[10]One of the attorneys who represented Stubbs in 2004 and 2005 had, by 2007, become a circuit court judge.  Carter suggests in his response memorandum that that judge

Statement, Doc. 39, at 10; Carter's Resp. Mem., Doc. 35, at 19 n.8).  Upon being informed of the capias that same day, Carter went to the Sheriff's Office to turn himself in and was arrested by Stough and Deisler on the capias.  On May 24, Carter was relieved from duty without pay pending an internal investigation.[11]  (See Ex. 3 to Carter Dep.).

On May 25, 2007, Carter, accompanied by an attorney, was interviewed by Stough regarding the Stubbs case.  (Interview Tr., Ex. 6 to Carter Dep.).  Carter denied that Susan was present during the transaction with Stubbs and explained that that was why her name was not listed on the Stubbs case report.  (Id. at 2-3).[12]  Carter has maintained that position–and his innocence—throughout the investigation and this case.

_____

was involved in the issuance of the capias for Carter's arrest.  (See Doc. 35 at 7-8).  It is undisputed that Stough and Deisler talked to that judge about the Stubbs case in the course of gathering information about it.  (See Incident Report, part of Ex. 7 to Carter Dep., at 9-10). No evidence has been brought to the Court's attention that would support Carter's suggestion that that judge had any involvement with the issuance of the capias.  The only involvement by the judge borne out by the record is that he was a fact witness as a result of knowledge he gained in representing Stubbs on the criminal charges that arose from the cocaine transaction.

[11](See Sheriff's General Order 342.0 § 4.F, Doc. 34-19 (providing for suspension without pay where an employee is arrested for or charged with a felony or misdemeanor)).

[12]According to Carter, he had met Susan at a bus stop across the street from the ABC earlier that day, and his supervisors instructed him to see if he could pick her up on a prostitution charge.  Carter and Susan went to Carter's nearby car, but the supervisors then intervened.  After the supervisors' intervention, Susan assisted the officers with a purchase of cocaine from a house, and after that, Carter never saw her again.  Carter then went back to the bus stop and tried to buy crack cocaine from a man there.  The man told him he did not do drugs and that if Carter wanted drugs he should go behind the ABC store.  Carter then went behind the store and made the buy from Stubbs.  Carter denied any involvement of Susan in the Stubbs transaction, maintaining that his interaction with Susan that day was completely separate from his interaction with Stubbs and that he was by himself when he bought the drugs from Stubbs.  (See Tr. of May 26, 2007 Interview, Ex. 6 to Carter Dep.).

Following Carter's arrest, PSD submitted two other cases involving Carter to the state attorney's office for review for possible prosecution, but the state attorney's office did not file charges in those cases.  (See Carter Dep. at 118; Ex. 11 to Carter Dep., at 3; Administrative Investigation Report, Ex. 10 to Carter Dep., at 22-23).  PSD also investigated a fourth case involving Carter but did not submit it to the state attorney's office.  (Ex. 11 to Carter Dep., at 3; Administrative Investigation Report at 23-24).  On September 27, 2007, the state attorney's office dropped the perjury charge that arose from the Stubbs case, citing inability to locate a key witness.  (Ex. 7 to Carter Dep., at 1).  Carter then returned to work at the Sheriff's Office and was transferred to the Records Division pending an administrative investigation by PSD.  (Carter Dep. at 119-22).

Beginning on October 9, 2007, PSD conducted an administrative investigation of the Narcotics Unit as a whole.  That investigation included allegations against and investigation of Chief Otterbarcher, Commander Stonebreaker, Green, McMillan, Ferrer, Ortiz, Carter, and Lane.  PSD compiled a 251-page administrative report that was signed by Deisler, Stough, and PSD supervisors on March 13, 2008.  (Ex. 10 to Carter Dep.).  With regard to Carter, the report included the notation that Deputy Ortiz—another member of the Narcotics Unit who was investigated and arrested[13]—told Carter's attorney on May 24, 2007 that Ortiz had, as a member of the takedown team, observed the transaction between Carter and Stubbs and that Carter conducted the buy directly with Stubbs.  (See id. at 150).  Additionally, the report notes that on June 4, 2007, Sergeant Green stated that Susan was in her presence

_____

[13]The state attorney's office filed charges against Ortiz for perjury in an official proceeding on September 15, 2007.  (Administrative Investigation Report at 18).

-8-

at the time of the arrest of Stubbs, suggesting that Susan was not at the scene.  (See id.).[14]

The report ultimately concluded that based on a preponderance of the evidence, in the Stubbs case Carter had committed perjury in official proceedings and that therefore the allegation that Carter had violated a Sheriff's Office's written directive regarding "Conformance to Laws" was sustained.  Four other policy violation allegations against Carter based on other cases were also sustained, and one was not sustained.[15]  The Report's conclusions regarding Carter were summarized in a memorandum to Carter that same day from PSD Captain Larry Krantz, (Ex. 12 to Carter Dep.), and on April 1, 2008, Carter received Notices of Intention to Discipline with regard to the five policy violations that were sustained in the administrative report; in four of these, the intended disciplinary action noticed was termination.[16]  (Doc. 34-16).  Carter then requested an administrative review. (See id.).

Pursuant to the Sheriff's General Order 5.1.0, the disciplinary appeal process consists of two phases—first, review before an Administrative Review Captain, and second, review before a Disciplinary Appeals Board.  (See General Order 5.1.0, Doc. 34-18).  After

---

[14]Stough testified in her deposition that Ortiz and Green gave these statements to Carter's attorney—after Carter's arrest—but not to PSD. (Stough Dep. at 137-39). PSD had called them in prior to Carter's arrest, but they declined to talk.  (Id. at 139).

[15]Three of the four other sustained policy violations against Carter were also for violations of the "conformance to laws" directive—two for perjury in an official proceeding and one for perjury not in an official proceeding.  The fourth sustained policy violation was "unsatisfactory performance" based on a lack of documentation in support of a case.  (See Administrative Investigation Report at 237-40).

[16]In the fifth, the intended discipline was forty-one hours' suspension without pay. (Doc. 34-16 at 1).

submitting an appeals packet to Administrative Review Captain Sandy Carpenter on May 10, 2008, Carter appeared before Carpenter for a hearing on May 16, 2008.  (See Ex. 13 to Carter Dep.).  Following that hearing, Carpenter found Carter's appeals regarding all five of the alleged policy violations to be without merit.  (See id.).

On June 4, 2008, Carter was issued Notices of Disciplinary Action that advised of termination.   (Ex. 14 to Carter Dep.).   Carter then requested the second phase of review—review before a three-member Disciplinary Appeals Board.  (See id.).  Carter's public Disciplinary Appeals Board hearing was held on August 26, 2008.[17]  (See Ex. 15 to Carter Dep.).  By one unanimous vote and four two-to-one votes, the Disciplinary Appeals Board upheld four of the five findings of policy violations by Carter.[18]  (See Exs. 15 & 16 to Carter Dep.).  The Sheriff, as "the ultimate authority in all matters of discipline," (see General Order 5.1.0 at 21), then reviewed the Disciplinary Appeals Board's  results and, in a letter dated September 3, 2008, informed Carter that he agreed with the Board's conclusions.  (Ex. 16 to Carter Dep.).  Carter was terminated effective June 5, 2008.  (Id.).

Carter filed this lawsuit on October 12, 2011.  (Doc. 1).  In the three-count Second Amended Complaint (Doc. 29), Carter alleges that in terminating him the Sheriff

---

[17]As provided for in General order 5.1.0, each three-member Disciplinary Appeals Board consists of one captain, one commander, and one deputy sheriff.  (General Order 5.1.0, Doc. 34-18).  The members of Carter's Disciplinary Appeals Board were Captain Tom Foster, Commander Brenda Brandenburger, and Deputy First Class Mike Walsh.  (See Ex. 15 to Carter Dep.).

[18]Board member Walsh found merit to four of Carter's five appeals, including the appeal regarding the Stubbs case.  (See Ex. 15 to Carter Dep.).  Walsh noted that the Stubbs case came down to the word of three deputy sheriffs versus the word of Stubbs and Susan.  (See id.).

discriminated against him based on his race in violation of 42 U.S.C. § 1981 (Count I); that he was deprived of a liberty interest without due process of law (Count II); and that he was arrested without probable cause (Count III).  The Sheriff now seeks summary judgment in his favor on all of these counts.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." <u>Anderson</u>, 477 U.S. at 249.  "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Sawyer</u>, 243 F. Supp. 2d at 1262 (quoting <u>Anderson</u>, 477 U.S. at 251-52); <u>see also</u> <u>Laroche v. Denny's, Inc.</u>, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").  "[T]he summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1026 (11th Cir. 2000).

### III.  Discussion

#### A.  Count I—§ 1981

In his first claim, Carter contends that the Sheriff's Office discriminated against him based on his race in violation of 42 U.S.C. § 1981 when it arrested him and terminated him.[19] The Sheriff has established entitlement to summary judgment on this claim.

The parties agree that the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 344 U.S. 792 (1973), and its progeny that applies in Title VII cases also applies to Carter's § 1981 claim.  <u>See, e.g.</u>, <u>Jefferson v. Burger King Corp.</u>, 505 F. App'x 830, 832 (11th Cir. 2013).  Under this three-part framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance

---

[19]In his motion, the Sheriff also addresses Carter's relief from duty and his transfer, but Carter clarifies in his response memorandum that he does not take issue with either of those actions and is only challenging his arrest and termination.  (<u>See</u> Doc. 35 at 11).

of the evidence. McDonnell Douglas, 411 U.S. at 802. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff establishes a prima facie case, a presumption of discrimination arises. See, e.g., Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

If the plaintiff presents a prima facie case and its attendant presumption, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802. The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff can establish a prima facie case of disparate treatment by showing that he was: (1) a member of a protected class; (2) subjected to an adverse employment action; (3) treated less favorably than similarly situated employees outside of his protected group; and (4) qualified for his job. Burke-Fowler v. Orange Cnty., 447 F.3d 1319, 1323 (11th Cir. 2006). It is undisputed that Carter is a member of a protected class, was subjected to an adverse employment action, and was qualified. The Sheriff challenges only whether Carter

can establish the "similarly situated" element of a prima facie case.

The Sheriff notes that in his interrogatory responses, Carter identified three purported similarly situated employees who were not arrested or terminated:  Chief Ron Otterbacher and Sergeants Lisa Green and Grantham McMillan, all of whom were Caucasian supervisors in the Narcotics Unit.  (See Carter's Interrog. Resp. 23, Doc. 34-20 at 25).  The Sheriff maintains that none of these three is a proper comparator because none engaged in the same or similar conduct of which Carter was accused.  The Court agrees.

It is undisputed that PSD conducted criminal investigations of Green and McMillan.  (See Joint Pretrial Statement, Doc. 39, at 9; see also Administrative Investigation Report at 19 & 25).  In August 2007, PSD submitted a prosecutive summary to the state attorney's office regarding Green, alleging that Green had committed perjury while not in an official proceeding when she wrote a misleading report regarding a drug transaction involving a defendant named Gordon.  (See Administrative Investigation Report at 25).  The state attorney's office declined to file charges against Green, noting that the facts presented were not sufficient evidence to prove the case beyond a reasonable doubt.  (See id.).  Green was also administratively investigated regarding her actions in the Gordon case, and PSD determined that Green knew or should have known that her report was misleading; however, the allegation against her regarding "conformance to laws" in that case was found "not sustained" because of the evidence uncovered during the investigation showing that there was a widespread practice in the Narcotics Unit of improper report-writing.  (See id. at 194-208).  The administrative investigation did result in a charge of "unsatisfactory performance" being sustained against Green.  (Id. at 209).  Green appealed that finding and, after not

prevailing at the Administrative Review Captain phase, prevailed at her Disciplinary Appeals Board hearing, which was conducted by different board members than those who conducted Carter's Disciplinary Appeals Board.  (Carter Dep. at 150-53).

McMillan was investigated for perjury in an official proceeding based on his deposition testimony in a case involving a defendant named Melendez.  (See Administrative Investigation Report at 19).  The March 2008 Administrative Report notes that "the criminal case is currently inactive pending the receipt of additional information," (id.), and the administrative investigation regarding the Melendez matter resulted in the allegation of violation of "conformance to laws" being not sustained due to a lack of sufficient evidence, (id. at 236).  McMillan was also administratively investigated in two other cases for "unsatisfactory performance" and "unbecoming conduct," and both of those charges were sustained in the report.  (Id. at 233-35).  Like Green, McMillan appealed and prevailed at the Disciplinary Appeals Board level after losing before the Administrative Review Captain.  (Carter Dep. at 150-53).

Carter's final proposed comparator is Chief Otterbacher.  Otterbacher was investigated administratively but not criminally.  Administrative charges regarding "violation of rules" and "informants" were sustained against Otterbacher based on his failure to designate a custodian for confidential informant files.  (Administrative Investigation Report at 226, 228).

In arguing that Green, McMillan, and Otterbacher are not appropriate comparators, the Sheriff notes that to be similarly situated in a misconduct case, comparators must have been involved in the same or similar misconduct.  Indeed, the Eleventh Circuit has held that

"[w]hen the plaintiff alleges, as here, that other employees engaged in similar misconduct but were not similarly disciplined, the plaintiff must produce evidence that 'the quantity and quality of the comparator's misconduct [was] nearly identical.'" Wolfe v. Postmaster Gen., 488 F. App'x 465, 468 (11th Cir. 2012) (alteration in original) (quoting McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008)).

Carter contends that Green, McMillan, and Otterbacher were "non-minority supervisors who condoned the practices identified in the [administrative] report" and that because "all three were assigned to assist with the Narcotics Unit, they were similarly situated in all relevant respects." (Doc. 35 at 12-13 (citation, internal quotation, and emphasis omitted)). He acknowledges, however, that "it is true, as the Sheriff notes, that the alleged comparators to Carter were not charged with the identical allegations." (Id. at 13).

Carter relies heavily on the Eleventh Circuit's opinion in Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011), asserting that that decision is a "recent expansion of 'comparator.'" (Doc. 35 at 13). However, Smith does not assist Carter. The Smith plaintiff was a white supervisory employee who was terminated for violating Lockheed's "zero tolerance" workplace conduct policy by forwarding a racially offensive email. Presented with evidence that two black non-supervisors who transmitted an email offensive to whites were not terminated, the district court concluded that the plaintiff failed to identify an appropriate comparator because there was not a more favorably treated black supervisory employee. See 644 F.3d at 1326.

The district court granted summary judgment for Lockheed, but the Eleventh Circuit reversed. In doing so, the appellate court explained that "[i]f the record contained no

circumstantial evidence from which a jury could otherwise infer that [the plaintiff] was fired because of his race, our discussion would end here, and we would affirm the district court's judgment." 644 F.3d at 1327-28 (footnote omitted).  The court then noted, however, that "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id. at 1328. Continuing, the Smith panel opined that "[a] triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" Id. (footnote omitted) (quoting Silverman v. Bd. of Educ., 637 F.3d 729, 734 (7th Cir. 2011)). The court concluded that the plaintiff in that case "did not need to rely on the McDonnell Douglas presumption to establish a case for the jury" because "the record contained sufficient evidence to allow a jury to infer that Lockheed fired [him] because he is white." Id.

This Court does not read Smith as standing for the expansion of the concept of a similarly-situated comparator as asserted by Carter.  Instead, the court held that the plaintiff in that case did not need to rely on the McDonnell Douglas prima facie case elements to survive summary judgment because of other circumstantial evidence supporting an inference of race-based discrimination.[20]   Carter has not identified a similarly-situated comparator—one who engaged in the same misconduct but received more favorable

---

[20]Moreover, in Smith the court noted that white non-supervisors were also terminated and thus were treated less favorably than black non-supervisors, supporting an inference that the plaintiff was also discriminated against because of his race and undermining the defendant's explanation that the plaintiff was treated more harshly because he was a supervisor.  See 644 F.3d at 1341-44.  And, in Smith, the misconduct was identical—a circumstance that Carter concedes does not exist in this case.

treatment—and thus he has not satisfied the third prima facie element.

Carter also argues that "the chaotic atmosphere of the [Narcotics] Unit" and the fact that minority officers were more often used as undercover officers led to him and other minority officers having to testify—as in the Stubbs case, for which he was ultimately terminated for being found to have been untruthful.  (Doc. 35 at 14).  As the Sheriff aptly notes, "[b]asically, Carter claims that if he was not African-American, he would not have been working undercover, and he would not have been put in a position to lie about confidential informants."  (Doc. 34 at 20 n.16).

Carter's contentions in this regard are rejected.  It is undisputed that there was a chaotic atmosphere in the Narcotics Unit and that many troubling practices—from top to bottom—were discovered during the PSD investigation of the entire unit.  These included improper report writing, failure to disclose and document informants, and an undue emphasis on the number of arrests made.  Nevertheless, Carter has not presented evidence suggesting that the investigation was conducted in any racially discriminatory way.  Those whose reports looked troubling were investigated, and those whose reports did not—including at least two of the four black deputies in the Unit—were not investigated. White employees were also criminally investigated and reported to the state attorney's office, and administrative allegations were sustained against whites as well.  Carter has not presented "a convincing mosaic of circumstantial evidence"[21] as in Smith,[22] and his claim

---

[21]Carter has not identified any direct evidence of discrimination, which is defined as "evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  He does identify, as circumstantial evidence, one comment

does not survive summary judgment on this basis either.

Even if Carter had presented a prima facie case of race-based disparate treatment with regard to his arrest or termination, the Sheriff has presented a legitimate nondiscriminatory reason for these actions—its investigation of several cases involving alleged misconduct by Carter, which led to the conclusion by the Sheriff's Office that there was probable cause to believe that Carter had committed perjury and, ultimately, that Carter had indeed committed most of the policy infractions charged.  Thus, the Sheriff is entitled to summary judgment unless Carter presents evidence creating a genuine issue of material fact regarding whether the Sheriff's asserted reasons are a mere pretext for race discrimination. See, e.g., Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.").

In determining whether an issue has been raised as to pretext, this Court "must, in

_____

allegedly made to him by Deisler.  (See Doc. 35 at 13).  According to Carter, during an interview Deisler, acting unprofessionally and with an intimidating demeanor, told Carter that it was going to go "[t]he same way your boy went down," in apparent reference to Lane. (Carter Dep. at 86).  Deisler denies making this comment, (see Deisler Dep. at 103), but even accepting Carter's version of events, this isolated comment does not amount to a "convincing mosaic of circumstantial evidence" sufficient to create a prima facie case.  Even Carter characterizes this remark as one that "could" be deemed a racist comment, (see Doc. 35 at 13), but one isolated, arguable remark is not enough.  Carter also notes that he, Lane, and Ortiz were the only officers terminated as a result of the investigation, but that fact also fails to create an inference of race-based discrimination.

[22]The facts of Smith are indeed highly distinguishable.  As recounted in the Eleventh Circuit's opinion, there was a history of racial tension and violence at the company involved there that is unlike any circumstance present in the record of the case at bar.

view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs, 106 F.3d at 1538 (citation and internal quotation omitted).  This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)).  "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." Holifield, 115 F.3d at 1565.

Under these standards, Carter has failed to present evidence creating a genuine issue of material fact regarding pretext.  See Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (finding no issue raised as to pretext where evidence presented did "not provide the needed 'more than a mere scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present a substantial conflict in the evidence as to [the employer's] purported reason for terminating [the plaintiff] . . . as to support a jury question").  Carter suggests that the Sheriff's Office did not follow its progressive discipline policy—Carter had not previously been issued any discipline—but Carter does not assert that the "nonconformance to laws" violations that he was found to have committed, including perjury during a trial, were not severe enough to warrant termination despite his lack of prior discipline.

Carter also argues that "[t]he Sheriff's justification [for his termination] has become a 'moving target,'" asserting that the Sheriff shifted from criminal allegations to, after the state attorney dropped the Stubbs-based charges, policy violation allegations. (Doc. 35 at 16-17). However, the facts that the state attorney's office dropped the criminal charge and that the Sheriff's Office thereafter administratively investigated Carter—along with the rest of the Narcotics Unit—does not render the Sheriff's proffered reason "a moving target." On the contrary, the reason for the Sheriff's investigation and termination of Carter has remained consistent, and the dismissal of the criminal charge due to an unavailable witness did not preclude the Sheriff from administratively investigating the same conduct under its internal standards.

Finally, Carter asserts that "the bulk of the performance issues identified by the Sheriff were, in fact, the result of Carter's training by his non-minority supervisors . . . , a fact acknowledged even by Deisler." (Doc. 35 at 17 (citing Deisler Dep. at 87)). The cited deposition testimony of Deisler pertains to report writing; Deisler agreed that "[w]hat [Carter] was doing with his reports was what everyone else was doing with their reports." (Deisler Dep. at 87). However, Carter was terminated because he was found to have violated policies by being untruthful in trial and deposition testimony, not because he wrote his reports in the manner that was found by PSD to be common—though improper—in the Narcotics Unit.

In sum, Carter has not presented evidence creating a genuine issue of material fact as to whether his arrest or termination was due to a race-based discriminatory animus. The record evidence instead reflects that PSD investigated the entire Narcotics Unit after an

attorney complained about the conduct of another agent.  Results of that investigation varied from deputy to deputy, but there is no evidence of any race-based differentiation among those who were investigated and disciplined.[23]  See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 70 (1st Cir. 2002) (affirming summary judgment for employer, noting that the "proffered reasons for [the plaintiff's] termination are plausible and coherent, and neither [the plaintiff's] criticisms of those reasons nor her independent circumstantial evidence of an improper motive, whether taken apart or together, are sufficient to require a jury trial").  Accordingly, the Sheriff is entitled to summary judgment on Carter's claim of race-based arrest and termination.

B.  Count II—Due Process

The due process claim that Carter brings in Count II is based on damage to his reputation allegedly caused by the charges against him and their placement in his personnel records.  "While damage to reputation, standing alone, does not provide the basis for an action under Section 1983, when such damage is sustained in connection with a termination of employment . . . it may give rise to a claim for deprivation of liberty actionable under

---

[23]Carter also avers that there was "an alarming trend towards terminating minority officers" between 2004 and 2008, contending that 68% of the Sheriff's Office employees arrested during that time were minorities.  (Doc. 35 at 15 (citing Sheriff's Interrog. Resp. 1, Ex. 2 to Doc. 35 at 3)).  However, Carter does not explain how arrests correlate to terminations, nor has he presented any evidence of why these employees were arrested, who arrested them, or whether the Sheriff had any involvement whatsoever in them being arrested.  Moreover, Carter suggests only that "upon information and belief," a majority of sworn law enforcement officers—not even "employees" as stated in the interrogatory—during that time period were non-minorities.  (Id. at 15 & n.7).  Carter's attempt to rely on inconsistent, nonprobative statistics is unavailing; this "data" does not present a triable issue as to pretext either.

Section 1983."  Campbell v. Pierce Cnty., 741 F.2d 1342, 1344 (11th Cir. 1984) (citation omitted).  As the Sheriff correctly argues in its motion, however, this claim does not survive summary judgment.

To establish a claim for deprivation of a liberty interest without due process of law, a plaintiff must show:  "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for name clearing."  Buxton v. City of Plant City, 871 F.2d 1037, 1042-43 (11th Cir. 1989) (footnotes omitted).  The Sheriff challenges Plaintiff's satisfaction of the first and last elements, asserting that no false statements are involved here and that in any event Carter was afforded multiple name-clearing hearings.

First, the Sheriff argues that no false statement attendant to Carter's termination was published because the Sheriff's Office determined that Carter committed policy violations. In other words, the Sheriff avers that because it is literally true that the Sheriff's Office investigated Carter's actions and concluded that he committed the alleged acts, no false statement is in Carter's personnel file.  However, as noted by Carter, the Eleventh Circuit has held in a similar case that a discharged deputy was entitled to a name-clearing hearing where the published allegations evidenced the sheriff's belief that the deputy had committed a crime.  See Andreu v. Sapp, 919 F.2d 637, 645 (11th Cir. 1990) ("The effect of the defendants' actions was to convey the message that [the plaintiff] was being considered for discharge despite the dismissal [of criminal charges against him] because the defendants thought he was guilty. . . . Under these circumstances, the plaintiff was entitled to a hearing to allow him an opportunity to rebut the charges."); accord Blair v. Martin Cnty. Sheriff's

-23-

Dep't, No. 92-14107-CIV-KEHOE, 1993 WL 757478, at *2 (S.D. Fla. Mar. 1, 1993) ("Statements which impugn [a terminated employee's] honesty and integrity trigger the employee's due process right to a name clearing hearing." (alteration in original) (internal quotation marks omitted)).  Under Andreu, an issue of fact remains as to the falsity of the statements in Carter's personnel file, and summary judgment cannot be granted on this basis.

The Sheriff also contends that even if the first five elements are met, Carter's due process claim fails on the sixth element because he was afforded multiple name-clearing hearings.  The Court cannot conclude that the hearings that Carter was afforded were insufficient to satisfy due process, and for that reason the Sheriff is entitled to summary judgment on this claim.

"[W]here a liberty interest arising from reputational damage is implicated, . . . [t]he hearings granted in such cases serve not to avert the unjustified denial of a specific benefit, but to allow the aggrieved party to 'clear his name.'" Campbell, 741 F.2d at 1345 (quoting Codd v. Velger, 429 U.S. 624, 627 (1977)).  "In cases involving only liberty interests, the courts have required only that the claimant be accorded notice of the charges against him and an opportunity 'to support his allegations by argument[,] however brief, and, if need be, by proof, however informal.'" Id. (quoting Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 16 n.17 (1978)).

It is undisputed that Carter received two levels of review—an Administrative Review Captain hearing and a Disciplinary Appeals Board hearing.  Prior to both hearings, he submitted material in support of his arguments, and he appeared in person at both hearings,

accompanied by counsel at the second.   Carter challenges the Administrative Review Captain hearing on the basis that Administrative Review Captain Carpenter allegedly did not read the entire Administrative Investigation Report but makes no responsive argument regarding the Disciplinary Appeals Board hearing.  (See Doc. 35 at 18).  The Court rejects Carter's contention that the hearings he was afforded were constitutionally inadequate, and Count II fails.

### C.  Count III—Probable Cause for Arrest

In his final claim, Carter asserts that he was arrested without probable cause in violation of the Fourth Amendment.  In seeking summary judgment on this claim, the Sheriff relies on the facially valid capias and also asserts that even absent the capias, probable cause existed for Carter's arrest.   Because Carter was arrested pursuant to a capias regarding which no constitutional impropriety has been shown, this claim fails.

It is undisputed that after conducting a criminal investigation regarding Carter's actions in the Stubbs case, Stough submitted her criminal investigation Incident Report and a charging affidavit to the state attorney's office for its consideration.  It is further undisputed that the state attorney's office then sought a capias from the circuit court, and the court issued the capias.  When Carter learned of the capias, he turned himself in at the Sheriff's Office and was arrested by Stough and Deisler on that capias.[24]

The Sheriff's Office thus played two distinct roles in Carter's arrest—it arrested him

---

[24]Cf. Albright v. Oliver, 510 U.S. 266, 271 (1994) (noting that petitioner's surrender upon learning of warrant issued for his arrest "constituted a seizure for purposes of the Fourth Amendment").

after issuance of the capias, and it also prepared the charging affidavit and investigative report that was presented to the state attorney's office prior to the issuance of the capias. Carter's Fourth Amendment claim clearly fails to the extent it is based solely on the former event.  An arrest on a facially valid capias will not support a false arrest claim.  See, e.g., Smith v. Gonzales, 670 F.2d 522, 526 (5th Cir. 1982) ("Where an arrest is made under authority of a properly issued warrant, the arrest simply is not a false arrest.").  As Carter acknowledged in his deposition, the Sheriff's Office could not legally ignore a capias that directed that an accused be arrested.  (Carter Dep. at 238).

Carter asserts, however, that the charging affidavit falsely accused him of committing perjury and that the Sheriff can be held liable on that basis.  In support, Carter relies on Harper v. City of Los Angeles, 533 F.3d 1010 (9th Cir. 2008), which involved the investigation, arrest, and prosecution of three police officers.  In addressing the city's argument that the prosecutor's filing of a criminal complaint immunized the investigating officers from a false arrest claim because it is presumed that the prosecutor exercised independent judgment in determining that probable cause existed, the Ninth Circuit noted that "[a] § 1983 plaintiff may rebut this presumption . . . by 'showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment.'"  Id. at 1027 (quoting Smiddy v. Varney, 655 F.2d 261, 266 (9th Cir. 1981)).

The Harper court found that the presumption of independent prosecutorial judgment was rebutted in that case, noting "unrebutted testimony that the District Attorney was not, in fact, 'independent' but worked 'hand-in-hand' with the [investigating] Task Force throughout the investigation"—entitling the jury "to believe that the Task Force and District Attorney were

engaged in an essentially joint investigation, which interfered with the District Attorney's independent judgment and tainted the prosecution's ultimate decision to file charges." Id. at 1027-28. The court also noted evidence that "the Task Force improperly exerted pressure on the District Attorney's office and failed to turn over evidence." Id. at 1028.

Carter contends that "Harper is analogous" because Stough testified in her deposition that the Sheriff's Office generally dealt with two prosecutors—including those involved in this case—most of the time. (Doc. 35 at 20 (citing Stough Dep. at 21)). Carter avers that "a jury could reasonably conclude [that] the State Attorney did rely almost entirely on Stough and Deisler's [administrative investigation] due to the working relationship between the Sheriff and State Attorney." (Id.).

Carter's reliance on Harper is misplaced. Even if that Ninth Circuit decision were binding on this Court, which it is not, it is factually distinguishable. The fact that the Sheriff's Office generally dealt with the two prosecutors at issue in submitting charging affidavits is not akin to the evidence of a "joint investigation" as in Harper. Carter has not identified any evidence—as opposed to pure conjecture—that the state attorney's office was involved with PSD in the investigation of Carter or that anyone at the Sheriff's Office pressured the state attorney's office to file criminal charges.[25] Harper does not support denial of summary judgment on Count III.

Carter also alleges that probable cause was lacking because Stubbs and Susan were

---

[25]Indeed, as earlier noted, in the two other cases that PSD submitted to the state attorney's office regarding Carter, the state attorney's office declined to prosecute, as it did with some cases involving other deputies.

not reasonably trustworthy and could not provide a basis for probable cause, but Carter's assertions fall short of meeting the legal standard for imposition of liability.  The exception to the general rule governing arrests pursuant to a warrant is that "[a] magistrate's issuance of the warrant will not shield an officer when the warrant affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable,' nor will it shield an officer when the underlying affidavit includes deliberate and reckless misstatements and omissions." Miller v. Prince George's Cnty., 475 F.3d 621, 632 (4th Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 345 (1986)); accord Mannoia v. Farrow, 476 F.3d 453, 458 (7th Cir. 2007) (explaining that where defendant was arrested pursuant to a facially valid warrant, detective could violate defendant's rights "only if a reasonable well-trained officer in [detective's] position should have known that the information he provided in support of the warrant would have failed to establish probable cause and that he should not have applied for the warrant in the first place").

Carter has not established that the charging affidavit was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable," nor has he identified "deliberate and reckless misstatements and omissions" in the charging affidavit. In that affidavit, Stough reported the facts known to her at the time, and Carter has not presented a basis for invalidating the arrest made pursuant to the capias.  The Sheriff is entitled to summary judgment on Count III.

## IV.  Conclusion

Carter continues to maintains his innocence of all criminal and administrative charges, and most of his arguments involve alleged flaws with the Sheriff's Office's investigations and

review decisions, including credibility determinations.  It is not, however, the task of this

Court to assess wholesale the investigative methods or findings of the Sheriff's Office.  The

only issues before this Court are whether Carter's claims of violations of his federal rights

survive summary judgment.  As set forth herein, they do not.

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.   Defendant's Case-Dispositive Motion for Summary Judgment (Doc. 34) is

**GRANTED** as to all of Plaintiff's claims.

2.   Any other pending motions are **DENIED as moot**.

3.   The Clerk is directed to enter a judgment providing that Plaintiff takes nothing on

any of his claims against Defendant.  Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida this 20th day of September, 2013.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record